Richard Johnston – SBN 124524
Johnston Law Office
131A Stony Circle, Suite 500
Santa Rosa, California 95401
Telephone (707) 939-5299
Facsimile (707) 837-9532
Richard.Johnston@Johnston-Law-Office.com

*Attorney for Plaintiff*
*Kathy E. Hotchkiss*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Kathy E. Hotchkiss,<br><br>   Plaintiff,<br><br>   vs.<br><br>Metropolitan Life Insurance Company,<br><br>   Defendant. | Case no.<br><br>COMPLAINT |

Plaintiff Kathy E. Hotchkiss submits this complaint and alleges:

**Jurisdiction and Venue**

1. This action arises under the Employee Retirement Income Security Act of 1974, 29 USC § 1001 et seq. (ERISA) and more particularly 29 USC §§ 1132(a)(1)(B), 1132(a)(2), 1132(a)(3), and 1132(g). This court has jurisdiction in this matter under 29 USC § 1132(e) and 28 USC § 1367(a). At relevant times, Ms. Hotchkiss resided in Santa Rosa, California; the named defendant, Metropolitan Life Insurance Company ("MetLife"), could be found in this district; and certain of MetLife's obligations, which obligations MetLife failed and refused to perform as herein alleged, were due within this district.

### Factual Background

*Ms. Hotchkiss's employment and Sutter Health's employee disability insurance coverage —LTD Plan and MetLife's insurance policy — MetLife's fiduciary status — Overview of Ms. Hotchkiss's occupational functions and disability*

2. Ms. Hotchkiss, at relevant times, was an employee of Sutter Health. As a function of this employment, Ms. Hotchkiss was and is a qualified participant in and beneficiary of the Sutter Health LTD Plan ("LTD Plan"), an employee benefit plan as defined by 29 USC § 1002(3). LTD Plan provided long-term disability insurance coverage to eligible Sutter Health employees.

3. LTD Plan's benefits were provided through a group disability insurance policy ("LTD Policy") issued by MetLife.

4. MetLife, in addition to issuing LTD Policy and funding benefits for participants and beneficiaries thereunder, also acted as adjudicator of claims submitted under LTD Policy, and was a fiduciary as defined by 29 USC § 1002(21)(A).

5. Prior to becoming disabled, since 2002 Ms. Hotchkiss was a notably successful Medical Coder at Sutter Health. Her occupational duties included constant sitting, using a computer and keyboard to read electronic health records. She did outpatient surgery coding, and read history and physical reports, consultation reports, and radiology reports. She also read operation reports and assigned diagnostic and procedure codes.

6. In October 2018, Ms. Hotchkiss was compelled to stop working due to a constellation of symptoms involving the lingering effects of a previously injured back, with severe chronic low back and right leg and foot pain. She was diagnosed with degenerative disc disease throughout her spine, in the cervical, thoracic and lumbar regions, as well as radiculopathy and myelopathy; she suffered from a constellation of other medical conditions as well, including tingling and numbness issues and a slipped tendon in her right hand; a torn rotator cuff; repetitive motion distress from frequent keyboarding; high blood pressure; high cholesterol; calcification of the coronary arteries; and incontinence and frequency. And by October 2018, when she was 69 years of age, her pain was debilitating.  After leaving work in October 2018, she attempted to return to work part-time in

March 2019, but the magnitude of her pain rendered this return-to-work attempt unsuccessful. She endured considerable discomfort in attempting to perform her occupational duties, and had to stop working due to her inability to sit at a desk and keyboard; this only caused great discomfort along with the fear that she was making her condition worse. Ms. Hotchkiss's condition has rendered her totally disabled and eligible for benefits according to the terms of LTD Policy.

*LTD Policy's Material Provisions*

7. LTD Policy provided for payment of benefits for so long as a claimant remained disabled as defined in the Policy. As pertinent here, for the contractual 180-day "Elimination Period" and the following 24 months, the Policy defined "Total Disability" thusly: "You are unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue Your Usual Occupation in the usual and customary way." Thereafter, LTD Policy defined "Total Disability" thusly: "You are not able to engage with reasonable continuity in any occupation in which You could reasonably be expected to perform satisfactorily in light of Your: age; education; training; experience; station in life; and physical and mental capacity."

8. LTD Policy also provided that MetLife was entitled to have any claimant examined by a practitioner of its choice.

*Ms. Hotchkiss's LTD claim to MetLife — Documentation provided to MetLife — MetLife approves LTD claim based on opinion of its retained physician consultant*

9. After her failed return-to-work attempt in March 2019, Ms. Hotchkiss submitted her LTD claim to MetLife on May 15 of that year. On MetLife's claim form, she indicated that she was unable to continue to work owing to paresthesias in her upper and lower extremities, and pain exacerbated by prolonged sitting and/or trying to adopt a sit/stand protocol, in both her upper and lower back. MetLife also secured medical records generated by Ms. Hotchkiss's treating physicians.

10. On June 17, 2019, MetLife referred Ms. Hotchkiss's medical records to one of its physician consultants, Ramin Rabbani, M.D. MetLife specifically requested that Dr. Rabbani opine whether "the medical information supports functional limitations beyond 10/21/18."

11. Dr. Rabbani responded in a report dated June 24, 2019. After recounting the medical records he had reviewed, Dr. Rabbani imposed restrictions and limitations on Ms. Hotchkiss, including: standing up to 20 minutes at a time for a total of two hours per day; walking up to 15 minutes at a time for a total of two hours per day; and sitting up to 20 minutes at a time for a total of four hours per day. His report noted that the "medical documentation reflects that the claimant is a 69-year-old female presenting with medical history significant for degenerative disc disease cervical, thoracic and lumbar; and cervical radiculopathy"; and "Considering the claimant's long history of musculoskeletal problems and her age along with the diagnosis of degenerative disc disease cervical, thoracic and lumbar, and cervical radiculopathy, she requires activity restrictions and limitations as stated." In a subsequent addendum to his report, Dr. Rabbani noted "the claimant's debilitating history with both upper and lower extremity findings including significant motor loss. Therefore, previous restrictions remain in place."

12. On August 29, 2019, MetLife approved Ms. Hotchkiss' LTD claim and provided contractual benefits.

*Ms. Hotchkiss continues treating for her disabling condition — COVID-19 disrupts ability to secure medical care — continuing information submitted to MetLife*

13. Ms. Hotchkiss continued to receive medical attention for her disabling conditions. On December 30, 2019, she advised MetLife that "I saw my orthopedist on October 15th and will see him again in March or April. I'm also going to request a second opinion, if possible, regarding the surgery he has recommended. I'm doing OK, now, with the modifications I've made to my life, but I want to understand my condition as well as possible. I will see my primary care physician, Dr. Van Dissel, on 12/31/19 for a regular checkup and will ask her about that as well."

14. The December 31, 2019 check-up was a "Medicare Annual Wellness Visit," which, according to Medicare's website, is "a yearly 'Wellness' visit once every 12 months to develop or update a personalized prevention plan to help prevent disease and disability, based on [the patient's] current health and risk factors. The yearly 'Wellness' visit isn't a physical exam." During the Wellness Visit, Dr. Van Dissel found that Ms. Hotchkiss was at risk for falling, and performed a test to measure

falling risk, denominated the get-up-and-go test. This test is one of limited scope; it is described as "a relatively quick outcome measure developed to test a person's balance and fall risk."

15. In March 2020 the COVID-19 crisis struck, causing vast disruptions in daily life. California Governor Gavin Newsom ordered "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors"; and that the "healthcare delivery system shall prioritize services to serving those who are the sickest and shall prioritize resources, including personal protective equipment, for the providers providing direct care to them." And the Centers for Disease Control advised "Older adults are more likely to get very sick from COVID-19. Getting very sick means that older adults with COVID-19 might need hospitalization, intensive care, or a ventilator to help them breathe, or they might even die. The risk increases for people in their 50s and increases in 60s, 70s, and 80s."

16. COVID-19 distinctly impacted the delivery of medical care. One well-respected medical information site advised "To limit the spread of the virus, you might want to cancel any medical appointments you can safely put off. When in doubt, call first," and "Many doctor's offices are making telehealth—online appointments—more available. If it's possible, your doctor may suggest a visit using the computer or phone." As Bloomberg Businessweek put it, "During a year when many hospitals in the U.S. saw a crush of COVID-19 patients, other kinds of medical care dropped off sharply. Insulin prescriptions went unwritten, and HIV tests were untaken. Cancer care was pushed off or canceled. People having heart attacks didn't go to the emergency room. [¶] The cause was the pandemic: People had been told to stay home and were afraid of becoming infected."

17. Although her condition was debilitating to the point that surgery had been recommended to Ms. Hotchkiss, she was reluctant to pursue that measure for COVID-related reasons. She was concerned as well about the risks and possible complications of the proposed surgery, such as failure of the bones to fuse, dysarthria, dysphagia, falling, and the fairly common need for a second or even third surgery. Her advanced age and comorbidities increased her risks and there was no guarantee that it would alleviate her symptoms. In addition, she lived alone and was concerned

about the need to convalesce in her home after the procedure without help or support. She worried that she could not afford the help needed and would still have to care for her pets and otherwise do what she could to maintain her living space and her life in general, all of which would be meaningfully compromised by her incapacitated condition following a major surgery.

18. COVID-19 interfered with Ms. Hotchkiss's access to medical care in other ways. She had another MediCare Wellness Visit scheduled for July 23, 2020. This time, however, to reduce personal contact, a scheduled in-person clinic visit was changed to a telephone consultation. Therefore, not only did this Wellness Visit not constitute a physical examination by its very nature, Ms. Hotchkiss and her physician were not even in the same building. Her physician again noted that Ms. Hotchkiss was at risk of falling, and noted among her medical conditions degenerative disc disease in her cervical, thoracic and lumbar regions. She also recorded that Ms. Hotchkiss didn't take longer than 12 seconds on the get-up-and-go test, although she was unable to observe any such test because she was in a different building from Ms. Hotchkiss; and the room where Ms. Hotchkiss was located was too small to allow for a proper get-up-and-go test, nor could the camera in use capture it adequately in any event.

> *Relying on registered-nurse opinions, MetLife overrules treating physicians — impact of COVID-19 disregarded in considering perceived gap in medical care — MetLife terminates LTD benefits*

19. In January 2021, a MetLife claim specialist asked for a "clinician" to help her assess Ms. Hotchkiss's claim, and despite the voluminous medical information in MetLife's possession, noted in connection with this request only the restrictions and limitations imposed by Dr. Rabbani: "standing occasionally up to 20 minutes at a time for a total of two hours per day, walking occasionally up to 15 minutes at a time for a total of two hours per day, sitting frequently up to 20 minutes at a time for a total of four hours per day." A week later, a MetLife staffer, despite the patent implications of the COVID-19 pandemic, added that "patient's only documented office visit in 2020 was 7/23/2020 Medicare annual visit, not on opiates, doing well, cognitive no sign of impairment, get up and go not longer than 12 seconds."

20. The very next day, January 28, the "clinician," a registered nurse working for MetLife, responded. Disregarding the vast majority of the medical evidence, and overruling not only Ms. Hotchkiss's treating physicians but MetLife's own physician consultant Dr. Rabbani, this nurse stated among other things that Ms. Hotchkiss had not treated, evaluated nor received prescription medications for lumbar, cervical or thoracic radiculopathy; that the record from the July 2020 telephonic Wellness Visit failed to denote cognitive deficits and indicated the get-up-and-go test had been completed in less than 12 seconds; that Ms. Hotchkiss was not on any pain medications or muscle relaxers; that the "physical examination" had been within normal limits and lacked any indication of numbness and tingling in extremities, or "escalation or management" for ongoing symptoms. Disregarding the impact of the COVID-19 pandemic, the nurse-consultant also stated "With employee primary impairing condition of radiculopathy, one would expect that if severity rose to a level to warrant restrictions and limitations, one would need treatment no less than every three to six months for management."

21. On February 26, 2021, MetLife, based solely on the opinion rendered by the nurse-consultant, determined to terminate Ms. Hotchkiss's LTD benefits. This determination, which was erroneous and unlawful, was conveyed to Ms. Hotchkiss in a letter dated March 2, 2021. The termination letter cited only the nurse-consultant's January 28, 2021 opinion, and justified the termination with the statement that "we have reviewed all of the medical records provided in support of your claim for LTD benefits. We have determined that they do not provide documentation of symptoms severe enough to require restrictions and limitations that preclude you from performing with reasonable continuity the Substantial and Material Acts necessary to pursue your Usual Occupation of an Outpatient Coder Team Member in the usual and customary way as described above beyond March 1, 2021. Therefore your claim for LTD benefits has been terminated."

22. Although contractually entitled to do so, MetLife did not have Ms. Hotchkiss examined by a physician or practitioner of its choice in connection with its evaluation of her LTD claim; that notwithstanding MetLife disregarded and otherwise discounted Ms. Hotchkiss's accounts of her

debilitating pain, based on nothing more than a paper record.

*Following termination, Ms. Hotchkiss engages with MetLife — additional substantiating documentation and information — Ms. Hotchkiss retains counsel and submits internal administrative appeal*

23. Upon receipt of the termination letter, Ms. Hotchkiss telephoned MetLife and conveyed additional information pertaining to her claim. Among other things she stated that the reason for the perceived "gap" in medical treatment was COVID-19, and she could not risk her life to go out; the July 2020 consultation was a telephonic Wellness Visit and not a physical exam; her orthopedist had provided to MetLife a record of a January 2021 consultation that had apparently been overlooked by MetLife; MetLife's LTD benefits were her primary source of income; she would be getting the COVID-19 vaccine shortly and would then see her orthopedist on April 20, 2021; she suffered from constant pain and numbness; she didn't take prescription painkillers but she did take Tylenol and Advil and used a heating pad for her neck and back; she did prescribed physical therapy exercises at home; and she could not sleep on her right side because it caused too much pain.

24. The January 2021 medical record referenced by Ms. Hotchkiss indicated variously that the focus of that particular consultation was Ms. Hotchkiss's neck; that Ms. Hotchkiss stated that she had been very anxious about her disease's progression and wished to discuss the possible complications of surgery and fear of being home alone after the surgery; that Ms. Hotchkiss had both radiculopathy and myelopathy; that her condition was sufficiently severe that a fusion at the cervical level had been recommended; and that she was at risk for falling, which could result in quadriplegia. The note concluded "these findings are based on the patient's best ability to communicate symptoms and without a physical exam. The patient was encouraged to follow up in the office when it is medically safe or reasonable to do so."

25. Later in March 2021, Ms. Hotchkiss again telephoned MetLife, explaining among other things that she had opted to not have the neck-fusion surgery right then, but she couldn't really get it anyway due to COVID-19. The same day MetLife referred the file to another registered-nurse

consultant for further review. But this nurse-consultant simply reiterated the erroneous conclusions of the previous one, stressing the perceived gap in treatment and stating that Ms. Hotchkiss was "not actively seeking treatment for her condition"; there were no complaints that "suggested a severity that Ms. Hotchkiss would not be able to perform a light to sedentary job"; and the nurse-consultant "concurred that with a primary impairing condition of radiculopathy, one would expect that if severity rose to a level to warrant restrictions or limitations, one would need treatment no less than every 3–6 months for management." (Cleaned up).

26. On March 19, 2021, MetLife advised Ms. Hotchkiss over the phone of the results of this second nurse-consultant's review. According to MetLife's associated claim file note, Ms. Hotchkiss explained again that she had several other conditions that she didn't treat because of COVID-19; and that she did not agree with MetLife's decision and didn't understand how MetLife could close her claim due to a remote Wellness Visit. MetLife's representative stated to Ms. Hotchkiss that Met Life had concluded that the severity of her conditions didn't warrant treatment because she was "only treating yearly." Ms. Hotchkiss reiterated that she didn't treat because of COVID-19, and she was high-risk between her age and her comorbidities.

27. Another entry into MetLife's' claim file notes, the same day as this last telephone conversation between Ms. Hotchkiss and MetLife, indicated that the January 2021 office visit had been for a one-year follow-up for radiculopathy and myelopathy. The claim file note added that "Based on this recent OVN it appears that Ms. Hotchkiss is still undergoing treatment for radiculopathy that doesn't appear to have resolved." (Cleaned up). That notwithstanding MetLife refused to reverse its termination of Ms. Hotchkiss's benefits.

28. Ms. Hotchkiss thereafter retained counsel, and on November 22, 2021, counsel submitted a timely formal administrative appeal to MetLife, pursuant to the provisions of LTD Policy. The November 2021 appeal recounted the foregoing facts, and described numerous deficiencies in the reasoning that MetLife had offered in support of its determination to terminate Ms. Hotchkiss's benefits. The appeal also provided a copy of an April 27, 2021 medical record that MetLife had previously refused to accept from Ms. Hotchkiss for the stated reason that she had retained

counsel. This record again confirmed that Ms. Hotchkiss had "L4 and L5 radiculopathy" and "some weakness in the L5 myotome as well." Counsel also enclosed a July 23, 2021 radiology report confirming ongoing severe radiculopathy stemming from Ms. Hotchkiss's cervical region.

29. The November 2021 appeal also contended, with citation to legal authority, that MetLife's conduct in connection with Ms. Hotchkiss's claim was unlawful in numerous respects. Among other things, the appeal maintained that MetLife had acted unlawfully in that its decision was against the great weight of the evidence; had engaged in unlawful adversarial conduct and cherry-picking; had based its determination on the opinions of underqualified consultants; had failed to take account of Ms. Hotchkiss's advanced age, although both LTD Policy and precepts of ERISA law required that it do so; and had unlawfully failed to take account of the impact of the COVID-19 pandemic in assessing the perceived "gap" in Ms. Hotchkiss's utilization of medical care.

> *MetLife produces medical consultant report and erroneous vocational report — Hotchkiss counsel objection to MetLife's unreasonably short response period — MetLife grants itself additional time to render decision — MetLife's precipitous decision well in advance of previously conveyed decision date — Pervious rationale for terminating benefits abandoned by MetLife — Information from Ms. Hotchkiss and treating medical providers disregarded — Termination of benefits upheld based solely on opinion of MetLife retained physician consultant*

30. After receiving the November 2021 internal appeal, MetLife posted a letter to Hotchkiss counsel on December 9, 2021. Accompanying the letter was a five-page, single-spaced report on the letterhead of third-party medical-review vendor Genex, authored by Marvin Pietruszka, M.D. In its letter MetLife demanded a response by or on behalf of Ms. Hotchkiss within ten days, or by December 19, 2021.

31. Dr. Pietruszka had never examined nor even met Ms. Hotchkiss. That notwithstanding, his report overruled the opinions of Ms. Hotchkiss's treating physicians, opining without explanation that Ms. Hotchkiss was able to sit and work for up to six hours per day. His report conveyed this opinion despite the facts that the records at hand plainly indicated, for example, that Ms. Hotchkiss's attempted return to work in March 2019 had been unsuccessful precisely because of exquisite pain brought on by sitting; and that her "pain begins with sitting and she is unable to

perform her computer based job *for any period of time* because the pain is just a constant ache and burn." (Emphasis added). The Pietruszka report contradicted even MetLife's own physician consultant, Dr. Rabbani, who had opined that Ms. Hotchkiss was able to sit only for a maximum of four hours per day, and that only 20 minutes at a time.

32. Five days later, on December 14, 2021, MetLife sent another letter to Hotchkiss counsel, this one accompanying what the letter described as an "Own Occupation Analysis/Labor Market Survey" pertinent to Ms. Hotchkiss's claim. Again MetLife demanded a response within just ten days, or by December 24, 2021. The enclosed document, however, pertained not to Ms. Hotchkiss but to another MetLife claimant, a "Ms. Hunter," who worked for a different company as an "Accounts Receivable Representative."

33. The next day, December 15, 2021, Hotchkiss counsel sent an email to the assigned MetLife claims representative, advising in pertinent part "The 'Own Occupation Analysis and Labor Market Analysis' that was provided, however, does not pertain to Ms. Hotchkiss but to someone called 'Ms. Hunter.' Of course it doesn't seem useful for us to respond to that." Counsel also advised that "I also have your December 9 letter and the accompanying medical review document. I will be writing more about that in the coming days, but as a preview I want to let you know that MetLife's unilateral deadline, especially in the middle of the holidays, is unreasonably short and we will require more time to secure a response."

34. MetLife responded with a letter on December 20, 2021, enclosing an "Own Occupation Analysis/Labor Market Survey" that did pertain to Ms. Hotchkiss. Despite counsel's indication that response periods of such short duration, especially in the middle of the holidays, were untenable, MetLife again imposed a unilateral 10-day deadline, demanding a response by December 30, 2021.

35. MetLife sent another letter to Hotchkiss counsel on December 28, 2021, explicitly granting itself—but not Ms. Hotchkiss—an extension of time. The MetLife letter asserted that "We need more time to review your client's appeal and reach a decision. You can expect to receive a final decision by February 20, 2022." The letter went on to explain that "We have referred the file to an Independent Physician Consultant for review and had an Own Occupation Analysis and Labor

Market Analysis done. We shared this information with you for review and comment. We may require additional time to review any responses received from you. We may require an additional 45 days to render a decision on the appeal."

36. Despite its unilateral extension to late February 2022 of its own response time, for the express purpose of "reviewing any response" received from or on behalf of Ms. Hotchkiss, MetLife upheld its own termination of LTD benefits on January 5, 2022. That day MetLife sent Hotchkiss counsel a letter stating that it had "completed our review of Ms. Hotchkiss' appeal," and that "we are upholding the termination of Ms. Hotchkiss' claim." Again MetLife's adverse benefit determination was erroneous and unlawful. Rather than upholding the previously asserted rationale based on a perceived "gap" in medical treatment, however, on internal appeal MetLife based its decision on Dr. Pietruszka's reported opinion, to the exclusion of the information received from Ms. Hotchkiss and her treating medical providers, and even to the exclusion of Dr. Rabbani's opinion.

37. Although contractually entitled to do so, MetLife did not have Ms. Hotchkiss examined by a physician or practitioner of its choice in connection with its evaluation of her internal appeal; that notwithstanding MetLife again, on appeal, disregarded and otherwise discounted Ms. Hotchkiss's accounts of her debilitating pain, based on nothing more than a paper record.

*Administrative remedies exhausted*

38. MetLife's January 2022 letter stated "This review constitutes MetLife's final determination on Appeal in accordance with the Plan and federal law." Ms. Hotchkiss has exhausted all administrative remedies under the LTD Policy, to no avail, inasmuch as MetLife has persisted in its wrongful conduct.

**First Claim for Relief
against MetLife
to recover benefits due under an ERISA plan, enforce rights
under the terms of the plan, and to clarify rights to future
benefits under the terms of the plan,
pursuant to 29 USC § 1132(a)(1)(B)
and
attorney fees and costs pursuant to 29 USC §1132(g)**

39. Ms. Hotchkiss refers to each and every foregoing paragraph of this complaint and incorporates those paragraphs as though set forth in full in this claim for relief.

40. As a direct and proximate result of the improper acts and/or omissions herein alleged, Ms. Hotchkiss has had benefits wrongfully withheld from her under the terms of LTD Policy.

41. As a direct and proximate result of the improper acts and/or omissions herein alleged, Ms. Hotchkiss has been compelled to incur reasonable attorney fees and other costs associated with the investigation of this claim and the prosecution of this action.

**Second Claim for Relief
against MetLife
for breach of trust and breach of fiduciary duty
pursuant to 29 USC § 1132(a)(2),
or, in the alternative, 29 USC § 1132(a)(3)
and
attorney fees and costs pursuant to 29 USC §1132(g)**

42. Ms. Hotchkiss refers to each and every foregoing paragraph of this complaint and incorporates those paragraphs as though set forth in full in this claim for relief.

43. In its capacity as an ERISA fiduciary, MetLife was subject to certain fiduciary duties, among them that it discharge its duties:

- for the exclusive purposes of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan;
- with the care, skill and diligence under the circumstances that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
- in accordance with the documents and instruments governing the Plan; and
- in accordance with the law.

44. MetLife, in initially denying and then affirming its own denial of Ms. Hotchkiss's claim for

LTD benefits, engaged in blatantly unfair conduct, in breach of its fiduciary duties, in breach of the terms of LTD Policy, and in violation of the law. This included conduct that MetLife was emphatically advised, with citation to legal authority, was improper and unlawful; that notwithstanding MetLife has ignored these binding judicial holdings and persisted in this improper and unlawful conduct in connection with Ms. Hotchkiss's claim for benefits. MetLife's unlawful and improper conduct has persisted generally with respect to LTD Plan and LTD Policy participants and beneficiaries. This ongoing and persistent conduct has degraded the security and reliability of Plan and Policy benefits and has thereby harmed the Plan and its participants and beneficiaries. By virtue of this conduct, MetLife has failed to discharge its duties: for the exclusive purposes of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan; with the care, skill and diligence under the circumstances that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; in accordance with the documents and instruments governing the Plan; or in compliance with the law. MetLife's conduct, with respect to Ms. Hotchkiss, and LTD Plan and its participants and beneficiaries generally, has been unfair, improper and unlawful in all respects discussed above.

45. As a consequence of MetLife's widespread and persistent breaches of its fiduciary duties and of the terms of LTD Plan and LTD Policy, in contravention of binding judicial holdings, Ms. Hotchkiss is entitled to seek, and seeks hereby, injunctive and other relief, as described below.

WHEREFORE, Ms. Hotchkiss prays for judgment as follows:

AS TO THE FIRST CLAIM FOR RELIEF:

1. An award of all benefits wrongfully withheld, with pre-judgment and post-judgment interest thereon;

2. A clarification of her entitlement to ongoing LTD benefits;

3. An award of attorney fees and costs of suit as authorized by statute;

4. For such other and further relief as the court may deem proper.

AS TO THE SECOND CLAIM FOR RELIEF:

5. An order enjoining the alleged improper acts and practices, or such other equitable or remedial relief with respect to Ms. Hotchkiss and LTD Plan as the Court may deem appropriate, including but not limited to the issuance of an injunction:

- Prohibiting MetLife from denying or terminating claims without taking substantive account of the claimant's age.
- Prohibiting MetLife from denying or terminating claims for benefits, without affording the claimant an opportunity to be examined by a physician or other appropriate practitioner of MetLife's choosing, in cases where the claimant's own treating physicians and/or practitioners unanimously opine that the claimant is unable to work.
- Requiring that MetLife, when advised in connection with a pending ERISA benefit claim that its conduct violates the law, conduct a good-faith analysis and evaluation of the merit of any such contention and provide a substantive response to the party issuing any such contention.
- Prohibiting MetLife from omitting consideration of a claimant's complaints of debilitating pain in determining a claimant's ability to perform occupational functions and requiring that MetLife evaluate in good faith the credibility and impact of such pain complaints.

6. An award of attorney fees and costs of suit as authorized by statute; and

7. For such other and further relief as the Court may deem proper.

Dated:  April 14, 2022

                                                    s/Richard Johnston
                                                    Richard Johnston
                                                    *Attorney for Plaintiff*
                                                    *Kathy E. Hotchkiss*